## KOHLER *vs.* KNAPP.

*In the matter of the Application of* ANDREW KOHLER *for letters of administration of the goods, chattels, and credits of* WILLIAM B. KNAPP, *deceased.*

GENERALLY, the authority as to administration, depends upon the domicil and place of death, or the *situs* of the assets at the time of death, or assets coming into the jurisdiction after death.

The jurisdiction of the Surrogate in relation to the estates of deceased persons, is the same as was possessed by the Colonial Governors of the province of New-York, and subsequently by the Court of Probate, except as restrained or regulated by statute. He must exercise his powers in the manner prescribed by statute, but in an omitted case should not decline jurisdiction, because the mode in which it is to be exercised is not prescribed.

The case of a person not an inhabitant of this State, dying in the county of the Surrogate, and leaving no assets there, but leaving assets in another county; and that of a person not an inhabitant, dying in the county, leaving no assets, but assets thereafter coming into the county, are not provided for, in terms, by the Revised Statutes.

An article alleged to have been the property of the intestate, temporarily brought into the county after his death on a bailment, but returned before the application for administration, does not form the subject of administration.

Debts due the intestate constitute assets at the place where the debtor resides.

A Foreign executor or administrator is not liable to account in the Courts of this State, unless he has brought assets of the decedent within this jurisdiction.

Rents of real estate belonging to the decedent, accruing and collected subsequent to his death, are not a part of the personalty, and do not form the basis of administration.

A. BENEDICT, *for Petitioner.*
CLARENCE D. SACKETT, *for Contestants.*

THE SURROGATE. The intestate was a resident of the State of Ohio; he became insane while on a visit to this city, and was placed by his friends in the Lunatic Asylum, where he died Nov. 6, 1841. Previous to his death, a committee of his person and estate had been appointed by the Court of Chancery of this State. The creditor, Andrew Kohler, having cited the next of kin to show cause why letters of administration should not issue, they appeared and contested the application.

Though the intestate died in this county, he was not an inhabitant of the State at the time of his death. He became a lunatic while here *in itinere.*

According to the practice of the Spiritual Courts, the Ordinary of the place where the deceased dwelt, has, generally speaking, jurisdiction over the administration of his personalty; but his authority only extends over the goods in his diocese. Accordingly, if there are *bona notabilia,* that is, goods to the amount of £5 in another diocese, administration must be granted by the Metropolitan of the Province, to save numerous administrations, and have one

administration serve for all. The rule is the same if a man not being *in itinere* die in one diocese, not having any goods there, but having *bona notabilia* in another diocese, because the Ordinary, where he dieth, by the law is to take as great care of the testator, as the other Ordinary where the goods are. (*Godolph., pt.* 1., *c.* 22, § 1, 2 ; 2 *Just.,* 398 ; *Com. Dig. Adm., (B.* 5) ; 2 *Bla. Com.,* 508 ; 1 *Rolle. Abr.,* 909 ; *Tit. Ex.,* 1, *pt.* 7 ; *Swinb., pt.,* 6, § 11, *sub.* 5.) The goods which a party who dies *in itinere* has with him at the time of his death, are supposed to be for the purpose of the jurisdiction of the Ordinary in the place where he is domiciled, notwithstanding his personal absence. (*Doe* vs. *Owens,* 2 *B. & Adol.,* 423.) If a man dies abroad, leaving *bona notabilia* in a single diocese, the Bishop of that diocese has jurisdiction. (*Scarth* vs. *The Bishop of London,* 1 *Hagg.,* 625 ; *Cecil* vs. *Darkin,* 1 *Freem. K. B.,* 256 ; *Griffith* vs. *Griffith, Sayer.,* 83 ; *Smith* vs. *Smith,* 3 *Hagg.,* 764, 765.) Thus inhabitancy and death in or out of the diocese leaving assets there ; or in other words, the domicil and place of death, or the *situs* of the assets, regulates the jurisdiction. In the various conflicts among the vast number of officers possessing probate jurisdiction in England, the principal question has generally been, which of these circumstances is controlling in any particular case, but there has never been any doubt that either of these grounds afforded a basis of jurisdiction. Where, however, an intestate has died abroad, not at the time leaving any assets within a particular diocese, but assets having thereafter come in, the authority of the Ordinary to administer thereon has been doubted. The old Common Law rule seems to have been, that the authority to administer was strictly confined to the Ordinary of the place where the intestate resided, or where he died leaving assets, or where the assets remained at the time of his death. Some of the cases hold that the administrator obtains title under his letters only to the goods of the deceased which were within the jurisdiction at the time of

his death; while there are numerous decisions sustaining the position that letters may be granted upon the sole basis of assets coming in subsequent to the decease, though the intestate resided and died abroad, and left no assets in the particular jurisdiction at the time of his death. (11 *Viner.*, 80; 3 *Bac. At.*, 37; *Went. Off. Ex.*, 107; *Swinb.*, 427; 4 *Burn's Ecc. L.*, 292; *Huthwaite* vs. *Phaire*, 1 *Man. & Gr.*, 165.; *Whyte* vs. *Rose*, 3 *Qu. B. R.*, 493; 1 *My. & Cr.*, 68; 2 *My. & Cr.*, 89; 2 *Madd.*, 101; 1 *Danl. Ch. Pr.*, 417; *Att'y Gen'l* vs. *Dimond*, 1 *Cr.'& Jer.*, 356; *Att'y Gen'l* vs. *Hope*, 1 *Cr. M. & Ros.*, 561; 2 *Hare*, 342, 353; 1 *Hare*, 482; 1 *Keen*, 74; 1 *Dowl. & Ry.*, 35; 5 *B. & C.*, 491; 1 *Cr. & Jer.*, 151; 4 *Hagg.*, 405; 1 *A. K. Marshall*, 303.)

The English Court of Chancery has uniformly refused to require an account of a foreign administrator or executor, at the instance of a creditor, legatee, or next of kin, when the foreign representative had brought the assets into England, without having an administrator appointed in England; thus recognizing the jurisdiction of the Spiritual Courts to grant administration in that case. The Chancellor in *McNamara* vs. *Dwyer*, 7 *Paige*, 243, recognized the right of one of the next of kin to call an Irish administrator to account in this State for assets brought here by him, and that too without the appointment of an administrator here; but his decision in that suit extended only to the denial, under the peculiar and pressing circumstances of the case; of the necessity of administration in order to institute proceedings in equity, and not to the denial of the jurisdiction of the Surrogate to grant administration. (*Bogert* vs. *Furman*, 10 *Paige*, 496; *Vroom* vs. *Van Horne*, 10 *Paige*, 557; *Shultz* vs. *Pulver*, 3 *Paige*, 182; 11 *Wend.*, 361; *Lawrence* vs. *Lawrence*, 3 *Bar. Ch. R.*, 74; *Brown* vs. *Brown*, 1 *Bar. Ch. R.*, 213.) Upon the whole, I am inclined to think that the modern rule, accommodating itself to new cases and exigencies, is in favor of the exercise of jurisdiction upon the sole basis of

assets of a foreign decedent coming into the State after his decease.

The jurisdiction of the Surrogate in relation to the grant of administration, I understand to be the same as was possessed by the Colonial Governors of the Province of New-York, under the act of the Colonial Assembly, 11th November, 1692 (*Bradford's Ed.*, *p.* 21), and subsequently devolved upon the Court of Probate, after the Revolution, by the act of 16th March, 1778 (*Greenleaf*, 1, 18, § 3), and extended to the Surrogate by the act of 1823. (*Session Laws*, *p.* 62.) It extends generally to the probate of last wills and testaments, and the granting of administration, except as restrained by statute. The Revised Statutes declare the authority of the Surrogate in general terms, " to grant letters testamentary and of administration." In the case of the estate of Thomas Gibbons, I examined the point of jurisdiction as affected by the provision inserted in the Statutes at the revision, restraining the Surrogate from exercising any other powers, except those expressly given, and came to the conclusion, that by the repeal of that limitation, by the act of 1837 (*p.* 536, § 71), the original jurisdiction was placed where it had previously been, except so far as it was regulated expressly by statute. Of course the Surrogate must in every enumerated case exercise his powers " in the cases, and in the manner prescribed by the statutes of this State." (2 *R. S.*, *3d ed.*, *p.* 318, § 1.) But in a *casus omissus*, he should not decline jurisdiction, because the law is silent as to the *mode* in which it is to be exercised, when it is apparent that a proper occasion to invoke his authority has arisen. I do not consider that the sections of the statute prescribing when the respective Surrogates " shall have sole and exclusive power" to take the probate of wills, and grant letters of administration (2 *R. S.*, *3d ed.*, *p.* 126, § 46 ; *p.* 137, §§ 24, 25, 26), cover all the cases. They only regulate so far as they go, the exercise of the jurisdiction in the particular instances specified. There are some which not

being enumerated are not reached, and in regard to which the jurisdiction of the Surrogate still subsists, though not expressly regulated. The will of a foreigner executed in this State while he was temporarily here, according to the forms prescribed by the law of the place of his domicil, is probably one of these exceptions. (*In the matter of Catharine Robert's will,* 8 *Paige,* 519.) The case of a person not an inhabitant of this State, *dying in the county* of the Surrogate, and leaving no assets there, but leaving assets in another county; and that of a person not an inhabitant, *dying in the county,* leaving no assets, but assets coming into the county after his death, are both unprovided for in terms; though if a non-inhabitant die *out* of the State under these circumstances, the grant of administration is regulated. There cannot in the nature of things be any reason why the administration of the assets of a non-inhabitant dying *in* the county, should not belong to the Surrogate as well as that of a non-inhabitant dying *out* of the State. On the contrary, the argument for the power in the former instance, is stronger than in the latter, and the only solution of the difficulty is, that the particular exigencies referred to were not contemplated.

Upon a view of the whole subject, I cannot regard this as any thing more than an omission to regulate the power of the several Surrogates, which does not in any wise restrict or limit their general authority to grant administration; and in the matter now under consideration, I see no bar to the grant of administration, provided the fact be established, that assets of the deceased have come into the county since his death, or were here at that time. But this is disputed. The testimony shows, that the intestate was insolvent at the time of his death, and there is no evidence that any assets were in the hands of his committee at his decease. Being confined in the Asylum, he had no clothing except what was provided for him by his friends, and belonged to them. Having left no assets in this State at the time of his death, the only remaining question is, whether

assets have come into the State since that time. It appears that some two years since, Dr. Belcher borrowed, at the residence of the intestate, an old cloak belonging to the deceased, which he brought into this State, and has since returned to the lender at the place where he received it. It can hardly be urged, that the loan of this article of trifling, if of any value, and its temporary situation on a bailment, in this county, can form the subject of a grant of administration. Besides the evidence on this point, and as to the ownership of the cloak, is very vague; and the article itself is now not within the limits of this jurisdiction.

Under the will of William Knapp, the father of the intestate, who resided in Connecticut, the intestate was entitled, after the death of his mother, to certain real and personal property. His mother was living at the time of his decease, but has since died. The will was proved in Connecticut and the property was situated there. The executors having died, administration with the will annexed was granted to Samuel G. Cornell, a resident of that State, who, however, transacts business in the city of New-York. It is not pretended that the administrator has ever brought any part of the assets into this State. Even if he could be regarded as a debtor of the deceased, the rule is, that debts constitute assets where the debtor resides; and Connecticut would, therefore, be the place or *situs* of such assets. But his grant of administration was made subsequent to the decease of the intestate, and his liability, if any, springs out of his letters of administration. If the intestate were even now living, he could not sue this administrator of his father, in our Courts, either at law or in equity, unless he had brought assets of his testator into this State. The administrator would only have been liable to account for assets received in Connecticut, and administered or remaining there, in the Courts of that State. Much less, then, does this liability to account in Connecticut, constitute now, after the death of William B. Knapp, assets in

this jurisdiction.    The whole of the estate of William Knapp, the father, was in Connecticut, and has been administered upon there, and that is the *forum* for settling the accounts of the administrator, and ascertaining his liability, if any.    If there be any thing due the representatives of Wm. B. Knapp, on account of his father's estate, that fact can only be satisfactorily ascertained in that State, and the creditors of the deceased should seek administration in the only place where it can be effectual.

F. W. Knapp, who resides in this city, appears to have collected the rents of some real estate in Connecticut, devised to the intestate under his father's will.    This transpired subsequent to the intestate's death, and does not form the basis of administration any where.    The real estate of the intestate passed to his heirs at law, and if his creditors seek to enforce their claims against it, they must go to the place where the property is.    (*Peck* vs. *Mead,* 2 *Wendell,* 470; 16 *Mass. R.,* 280; 9 *Mass. R.,* 395.)    Rents accruing subsequent to the intestate's death, of right went to the heirs; and an administrator would have nothing to do with them.    I do not see, therefore, any view of the case leading to the conclusion, that there exists any basis or subject of jurisdiction to grant administration in this State, and the application must, consequently, be denied.